**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Case No. 09-32562** |
| **O'HARE CENTRE VENTURE L.P.,** | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |
| _____ | ) | **Judge Bruce W. Black** |

# NOTICE OF HEARING

**PLEASE TAKE NOTICE** that on **Thursday, August 12, 2010** at **9:30 a.m.**, or as soon thereafter as counsel may be heard, the undersigned will appear before the Honorable Judge Bruce W. Black, or another judge sitting in his courtroom, Room 615 of the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, which is located at 219 S. Dearborn Street, Chicago, Illinois and then and there present **BARNES & THORNBURG LLP APPLICATION FOR APPROVAL OF FEES AND EXPENSES**, a copy of which is attached and hereby served upon you via the Court's ECF system and U.S. mail.

**BARNES & THORNBURG LLP**


By:  /s/ *Paula K. Jacobi*



Paula K. Jacobi (ARDC No. 1311247)
**Barnes & Thornburg LLP**
Chicago, Illinois  60606
(T)  (312) 214-4866
(F)  (312) 759-5646
pjacobi@btlaw.com

## CERTIFICATE OF SERVICE

I, Paula K. Jacobi, certify, under penalties of perjury as set forth at 735 ILCS 5/1-109, that I caused a copy of the foregoing **Notice of Hearing** and **BARNES & THORNBURG LLP APPLICATION FOR APPROVAL OF FEES AND EXPENSES** to be served on this 22nd day of July, 2010 on the following persons:

**Via the Court's ECF System and U.S. Mail:**

| | |
|---|---|
| D. Elaine Conway<br>Jackson Walker L.L.P.<br>1401 McKinney, Suite 1900<br>Houston, TX  77010<br>econway@jw.com<br>*Represents: Constellation NewEnergy, Inc.* | Joseph D Frank<br>Reed A Heiligman<br>Frank/Gecker LLP<br>325 N LaSalle, Suite 625<br>Chicago, IL 60654<br>jfrank@fgllp.com<br>rheiligman@fgllp.com<br>*Represents: Jones Lang LaSalle Americas (Illinois), L.P.* |
| Norman B Newman<br>Much Shelist Freed Denenberg<br>191 North Wacker Drive Ste 1800<br>Chicago, IL 60601<br>nnewman@muchshelist.com<br>*Represents: MASS Realty, LLC* | Kimberly A Bacher<br>Brian L Shaw<br>Peter J Roberts<br>Shaw Gussis Fishman Glantz WolfsonTowbin<br>321 N. Clark, Suite 800<br>Chicago, IL 60654<br>kbacher@shawgussis.com<br>bshaw100@shawgussis.com<br>proberts@shawgussis.com<br>*Represents: Five Mile Capital SPE A LLC* |
| Mark A Berkoff<br>Deborah M. Gutfeld<br>Neal, Gerber & Eisenberg LLP<br>Two North LaSalle Street, Suite 1700<br>Chicago, IL 60602-3801<br>mberkoff@ngelaw.com<br>dgutfeld@ngelaw.com<br>*Represents: Van Ru Credit Corporation* | Thomas R. Fawkes<br>Freeborn & Peters<br>311 S. Wacker Dr., Suite 3000<br>Chicago, IL  60606<br>tfawkes@freebornpeters.com<br>*Represents: Ex Libris (USA) Inc.* |

Elizabeth L Maxeiner
Sidley Austin LLP
1 S Dearborn
Chicago, IL 60603
emaxeiner@sidley.com
*Represents: Deutsche Bank AG Cayman Islands Branch*

Michael L. Gesas
Barry A Chatz
Kevin H Morse
Miriam R. Stein
Marc S Zaslovsky
Arnstein & Lehr, LLP
120 South Riverside Plaza
1200
Chicago, IL 60606-3910
mlgesas@arnstein.com
khmorse@arnstein.com
mrstein@arnstein.com
*Representing: O'Hare Centre Venture L.P.*

William T Neary
Office of the U.S. Trustee, Region 11
219 S Dearborn St, Room 873
Chicago, IL 60604

Charles S. Stahl, Jr.
Swanson, Martin & Bell, LLP
2525 Cabot Drive
Suite 204
Lisle, IL 60532
cstahl@smbtrials.com
*Represents: Ex Libris (USA) Inc.*

**Via B&T Email and U.S. Mail:**

Colin A. Regan, General Partner
MR Properties, LLC
1350 E. Touhy Avenue
Des Plaines, IL 60018
cregan@mrpropertiesllc.com

Philip I. Mappa, General Partner
MR Properties, LLC
1350 E. Touhy Avenue
Des Plaines, IL 60018
pmappa@mrpropertiesllc.com

/s/ Paula K. Jacobi

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS**
EASTERN DIVISION

In Re  O'Hare Centre Venture L.P.,           )
                                             )
                                             )  Bankruptcy No.  09-32562
                                             )
                              Debtor.        )  Chapter          11

**COVER SHEET FOR APPLICATION FOR PROFESSIONAL COMPENSATION
(IN CASES UNDER CHAPTERS 7, 11 AND 12)**

Name of Applicant: _____Barnes & Thornburg LLP_____

Authorized to Provide Professional Services to: _____O'Hare Centre Venture L.P._____

Date of Order Authorizing Employment: _____October 7, 2009_____

Period for Which Compensation is Sought:
From _____September 1_____, __2009__ through _____March 15_____, __2010__

Amount of Fees Sought:  $ 163,270.00

Amount of Expense Reimbursement Sought:  $ 9,781.31

This is an:   Interim Application _____     Final Application __✓__

If this is *not* the first application filed herein by this professional, disclose as to all prior fee applications:

| Date Filed | Period Covered | Total Requested (Fees & Expenses) | Total Allowed (Fees & Expenses) | Fees & Expenses Previously Paid |
|---|---|---|---|---|
| | | | | |

Dated: 7/22/2010                             _____
                                                                  (Counsel)

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Case No. 09-32562 |
| O'HARE CENTRE VENTURE L.P., ) | Chapter 11 |
| ) | |
| Debtor. ) | Judge Bruce W. Black |
| ) | |

## BARNES & THORNBURG LLP APPLICATION FOR APPROVAL OF FEES AND EXPENSES

Barnes & Thornburg LLP ("BT"), counsel for O'Hare Centre Venture L.P., debtor and debtor in possession in the above case ("Debtor"), from September 1, 2009 ("Petition Date"), the date on which the voluntary petition under Chapter 11 was filed, to March 15, 2010 the date on which an order was entered authorizing BT to withdraw as counsel to Debtor *instanter*, ("Application Period") moves for entry of an Order approving $163,270.00[1] in attorney fees and $9,781.31 in expenses advanced by BT during the Application Period. In support of this Application, BT states as follows:

### Background to Application

1. Debtor was a single-asset real estate entity, as defined in § 101 of the Bankruptcy Code ("Code") that commenced its Chapter 11 case on September 1, 2009 ("Petition Date") by filing a voluntary petition for relief.

2. Debtor was authorized by court order to retain BT as its Chapter 11 case pursuant to § 327 of the Code *nunc pro tunc* to the Petition Date. As in many Chapter 11 cases, BT anticipated filing a single fee application at the conclusion of this case. However, due to irreconcilable differences with Debtor, BT was given authority to withdraw as Debtor's counsel

---

[1] There is a $457.00 discrepancy between the final bill for this matter and Schedules 1 through 13 to this Application, but, to date, BT has been unable to determine the source of what appears to be a math error.

on March 15, 2010. Prior to BT filing its intended application, without notice to BT or BT's knowledge, Debtor had its Chapter 11 case dismissed in June 2010.[2]

**Background to Chapter 11 Filing**

3. Debtor was the beneficiary of Trust No. 101091 ("Trust") created by Trust Agreement dated July 2, 1979 ("Trust Agreement") of which LaSalle National Bank, N.A. is the Trustee. The Trust owned real property consisting of two, three-story office buildings containing 220,000 square feet located on an eight and a half acre parcel of land ("Property"). The Property is commonly known as 1350 East Touhy, Des Plaines, Illinois 60018.

4. As of the Petition Date, Debtor was in the business of owning and operating the Property and rental and related activities thereto. The Property was approximately 55% leased to a total of six tenants.

5. The Property was subject to a mortgage loan in the original amount of $22 million from a July 2004 loan from Northwestern Mutual Life Insurance Company ("Northwestern"). The Loan was evidenced *inter alia* by a Note and secured by a Mortgage and Security Agreement (referred to herein as modified/amended "Mortgage") and Absolute Assignment of Leases and Rents (referred to herein as modified/amended "Rent Assignment").

6. Numerous documents were executed as a part of the Loan transaction (when referred to collectively "Loan Documents"). The Loan Documents included an Escrow Agreement dated July 7, 2004 between Northwestern, Debtor and LaSalle National Bank, N.A. as escrow agent ("Escrow Agreement") which established two escrow accounts which Debtor funded with $2.250 million ("Escrow Funds"). The Escrow Funds were to be used for tenant

---

[2] Case law BT has located in other jurisdictions suggests that this Court has inherent jurisdiction to hear fee applications notwithstanding dismissal of a case.

2

improvements and leasing commissions ($2 million) and upgrading common areas on the Property ($250,000).

7. The Loan Documents had been modified numerous times after 2004 and had been assigned to subsequent lenders. Some of the modifications and assignments included:

    a. the January 2006, Northwestern assigned the Mortgage and Rent Assignment mortgage and assignment of rents to Societe Generale ("Societe");

    b. the December 2006, Societe assigned the Mortgage and Rent Assignment to Five Mile Capital SPE A LLC, a Delaware limited liability company, ("Five Mile");

    c. the December 2008 modification of the Mortgage, Rent Assignment and Note when an additional advance of $1,632,234.88 was made to Debtor. In connection with this modification, an Amended and Restated Deposit Account Control Agreement was entered into by and among Debtor, Five Mile, and PNC Bank, National Association and irrevocable letters of direction were given to tenants requiring all rents to be delivered into the control account;

    d. the June 2009 modification resulting in a Second Amended and Restated Promissory Note executed by Debtor and the Trust in favor of Five Mile in the amount of $23,632,234.85 and (ii) a Second Amended Mortgage and Security Agreement; and

    e. the June 2009, Omnibus Assignment and assignment of the Mortgage and Rent Assignment, Five Mile assigned all Loan Documents to Deutsche Bank AG, Cayman Islands Branch ("Deutsche"), without recourse and without covenant, representation or warranty except as expressly in a 2006 Master Repurchase Agreement between Five Mile and Deutsche.

8. As of the Petition Date, Deutsche had not recorded its assignment of the Mortgage or Rent Assignment against the Property and Five Mile took the position that notwithstanding the documentation between it and Deutsche, Five Mile was the holder of the Loan Documents.

9. Debtor filed its Chapter 11 for numerous reasons which included the following:

    a. A substantial lease on the Property terminated August 31, 2009. The loss of that rent income (until the space was fully relet) would have a significant impact on the cash flow of the Debtor. Debtor had sufficient cash to operate the Property, but no longer had sufficient cash flow to pay debt service and would be in default.

    b. Debtor has a dispute with the Lender regarding the Escrow Accounts. Debtor had entered into two, significant leases for the Property. The leases had

3

provisions providing funds for tenant improvement to be made to the lessees (at various times) and leasing commissions were incurred in obtaining these new leases. Notwithstanding Debtor's attempts prior to the Petition Date to have the funds released from the Escrow Account to the leasing brokers and to one of the tenant, Lender refused to release the Escrow Funds (with two exceptions). The one lessee, Van Ru Credit Corp., for whom Debtor attempted to get Escrow Funds released, pre-petition sent a notice of default to Debtor and threatened litigation and demanded lease modification if the funds were not received. One of the brokers, for whom Debtor attempted to Escrow Funds released, has threatened to lien the Property because of the non-payment.

  c. Debtor believed that loss or modification of the leases that provided for tenant improvement funds because of Debtor not being able to get the Escrow Funds would have a significant adverse effect on the Property. Additionally, being unable to get Escrow Funds for payment of leasing commissions also adversely affects the value of the Property because liens may be asserted against the Property and brokers are now unwilling to bring new tenants to the Property for fear of non-payment of leasing commissions.

  d. It was Debtor's position that Lender's refusal to allow disbursement of the Escrow Funds breached its obligations under the Loan Documents. Debtor wanted to address this dispute through Chapter 11 proceedings.

  e. Prior to the Petition Date, Lender had engaged Eastdil Secured to try and sell Lender's position in the Loan Documents. Debtor had attempted to negotiate for the purchase of the Loan Documents. However, Lender would not discuss the matter with Debtor without Debtor signing an agreement which would have waived all of Debtor's rights against Lender. Given the situation with the Escrow Funds, in particular, Debtor could not execute such an agreement. As such, Debtor hopes to negotiate with Lender and through a plan, which hopefully will be consensual, "purchase the Loan Documents" and resolve the Loan through a Chapter 11.

**Chapter 11 Case**

10. Promptly upon commencement of this case, BT worked with Lender to reach an agreement regarding the PNC control account into which all proceeds from the Property automatically were deposited. It was agreed that irrespective of whether PNC was a "custodian" under Section 542 of the Code, cash collateral would continue to go into the control account and PNC would have to disburse to Debtor all funds authorized to be used by court order.

11. BT next negotiated with Lender for use of cash collateral. Lender objected to portions of the budget and, with respect to one item—management fees—agreement could not be

4

reached. BT conducted hearing the matter and was successful in getting use of cash collateral based on the budget Debtor requested over the objection of Lender.

12. Promptly upon commencement of the Chapter 11, BT worked with Debtor gathering information, analyzing records all to prepare Debtor's schedules and statement of financial affairs. Additionally, given the shorter time frame for single asset cases, BT promptly sought, had set and provided all notices of a bar date for filing claims.

13. During the case, BT was successful in obtaining more time for Debtor under Section 362(d)(3) of the Code. Given the open issues as to who held the Loan and whether Lender Debtor was entitled to have the Lender claim subordinated, BT was able to extend the 90 day period under Section 362(d)(3) extended three times over the strenuous objections of Lender. These extensions gave Debtor the opportunity to attempt to get Lender to negotiate and, absent negotiation, prosecute its claim against Lender without having the automatic stay vacated and then, potentially losing the Property.

14. Because of the disputes regarding the Escrow Accounts and to obtain information needed to assess Lender's claim, who held the Loan, the value of the Property, whether Lender's refusal to disburse the Escrow Funds was related to Lender's attempt to sell the Loan prior to the Petition Date, BT sought for Debtor and obtained Rule 2004 discovery pursuant to motion and subpoenas. Obtaining the documents was not without objection.

15. BT reviewed thousands of documents produced to gather facts *inter alia* as to who owned the Loan, the value of the Property from Lender's perspective, background into the Escrow Accounts and why access was denied Debtor. This fact gathering was *inter alia* needed to attempt to negotiate a plan of reorganization with Lender and to determine claims Debtor had against Lender if a consensual plan was not possible.

16. BT thus spent a significant amount of time working with Debtor gathering facts, reviewing supporting documents, drafting and finalizing an Adversary Complaint against Lender seeking *inter alia* subordination of its claim. In order to file the Complaint, BT researched all potential claims against Lender. Lender responded to the Complaint with a motion for summary judgment as to Count V of the Complaint. BT sought on behalf of Debtor and was given leave to take discovery. BT issued and obtained discovery so that it could respond to the summary judgment motion. Prior to the time in which this was to be done irreconcilable issues arose between BT and Debtor and BT was given leave to withdraw as counsel.

17. From the outset of the case, Lender refused to negotiate or discuss a potential plan with Debtor. After six months of Lender refusing to negotiate or discuss the case with Debtor, however, BT was successful in getting all of the business people for Lender and its counsel to discuss a resolution of the case and potential settlement. Prior to an in-person meeting wherein Lender's representative would come to Chicago from New York, Lender required a conference call with all the principals of Debtor and BT. Moments before the conference call began, Debtor's principals determined that they were not going to participate. Although, BT was on the call and advised Lender of Debtor's position, Lender determined that given Debtor's principals decision not to participate, the in-person meeting to discuss settlement would not go forward.

18. During the time that BT was counsel to Debtor, much work was done with respect to the two tenants (Van Ru and Ex Libris) whose leases each required Tenant Improvement funds which were held in the Escrows Funds that Lender had withheld. If Debtor lost those tenants (Van Ru and Ex Librius), the Property would be virtually empty.

19. With respect to Van Ru, the largest of the two tenants, BT negotiated a temporary reduction in rent until the issue of the Escrow Funds could be resolved. The reduction negotiated

still allowed sufficient cash flow from the Property to meet its necessary operating needs. The relief requested was heavily contested by Lender. There were four hearings on the motion and BT had to respond to numerous briefs filed by Lender. In the end, the Court agreed with the relief requested by BT for Debtor and authorized the rent reduction.

20. With respect to Ex Librius, it filed a motion to vacate the automatic stay so that it could terminate its lease. On behalf of Debtor, BT opposed the relief requested. However, the Court held that the automatic stay did not apply and ruled that if the lease could be terminated under state law, Ex Librius could do so. BT worked with counsel to Ex Librius to contest the termination and to negotiate Ex Librius remaining on the Property. At the time BT withdrew as counsel, it had been successful in getting Ex Librius to extend the date when Ex Librius was vacating the Property.

21. In addition to the work described above, BT undertook all of the general tasks work needed in any chapter 11 case. For example, BT worked with Debtor on initial filing matters; BT obtained approval of adequate protection in the form of "pre-payment" under Section 366 of the Code for the utilities at the Property; BT responded to creditors during the case; BT worked with Debtor regarding new contract for gas with Constellations; BT worked with Debtor on its monthly budgets and preparing and submitting UST monthly reports; BT successfully got preliminary and final cash collateral use approved; BT attended initial meeting with UST and conducted the Section 341 first meeting of creditors; BT worked on pre-petition payroll matters; and BT was successful in getting approval for payment of real estate taxes approved.

22. In addition to the above work, with respect to attempting to formulate a plan of reorganization, BT also worked with Debtor on different options and tax structures. On behalf of

7

Debtor, BT prepared and proposed a "no-shop" agreement while Lender considered Debtor's offer to purchase the Loan. BT also worked on determining if there were any defects in the Loan documentation or perfection and analyzing the transaction between Five Mile and Deutsche and how that effected the Loan validity and who held the debt. All of this work regarding the Lender position and claims was needed to determine what was possible under a plan and what position Debtor had that would assist in negotiating with the Lender. BT also obtained an extension of the exclusive period for filing the plan.

23. This is BT's first and only request for compensation or reimbursement of costs advanced in representing Debtor during the Chapter 11 case. With respect to this Application, the following attorneys and paralegals have formed services for Debtor in this case with the numbers of hours spent during the Application Period, the hourly rate charged for each professional and the total cost for the work of each professional[3]:

| Attorney/or Paralegal (as noted) | Title | Hours Spent | Hourly Rate 9/2009-11/2009 | Hourly Rate 12/2009-3/2010 | Total |
|---|---|---|---|---|---|
| Paula K. Jacobi | Partner | 164.5 | $445 | $465 | $74,574.50 |
| Timothy Riffle | Partner | 5.7 | $510 | | $2,907.00 |
| Larry Blust | Partner | 2.3 | | $605 | $1,391.50 |
| Patrick Mears | Partner | .5 | $495 | | $247.50 |
| Deborah L. Thorne | Partner | 8.1 | $485 | $510 | $3,988.50 |
| Kevin Driscoll | Partner | 25.9 | $380 | 405 | $9,897.00 |
| Wesley Broquard | Asso/Part. | 4.1 | $325 | $345 | $1,408.50 |

---

[3] Excluded from this Application is approximately $21,162.00 in services that BT in its billing discretion believed appropriate to exclude.

8

| Attorney/or Paralegal (as noted) | Title | Hours Spent | Hourly Rate 9/2009-11/2009 | Hourly Rate 12/2009-3/2010 | Total |
|---|---|---|---|---|---|
| Jennifer Kimball | Associate | 189.7 | $270 | $290 | $53,771.00 |
| Lisa Updike | Associate | 6.3 | $255 | $275 | $1,658.50 |
| Matthew P. Tyrrell | Associate | 1.5 | $260 | | $390.00 |
| Jaafar Riazi | Associate | 45.5 | $275 | $295 | $12,974.50 |
| Katheen Fee | Paralegal | .30 | $205 | | $61.50 |
| **Totals** | | 454.40 | | | $163,270.00 |

The above hourly rates for legal services are the same rates generally charged by BT to its non-bankruptcy clients.

**Reasonable and Necessary Services by BT – Categories by Matter**

24. A detailed itemization of the professional time expended in connection with the cases is attached as Exhibit A, Schedules 1 through 13. In accordance with the factors enumerated in § 331 of the Code, the amount of fees requested is fair and reasonable given (i) the complexity of the issues in this case; (ii) the matters BT was able to succeed on notwithstanding considerable opposition by Lender; (iii) the time expended; (iv) the nature and extent of the services rendered; (v) the value of such services; and (vi) the costs of comparable services other than in cases under the Code; and (vii) the delay in receiving compensation.

BT submits that the fees requested are fair and reasonable and should be awarded, particularly in light of what counsel was able to accomplish prior to its withdrawal and the position that the Debtor was in as of the Petition Date, in particular Debtor having no access to its cash collateral or Escrow Accounts, all of which had been delivered prior to the Petition Date to Lender and were collateral for the Loan under the Control Account Agreement, and the

resistance of the Lender on all issues, and the significant deficiency position of the Loan versus the Property value.

25. Exhibit A (i) identifies the individuals that rendered services in each Subject Matter (as defined below), (ii) describes each activity or service that each individual performed, and (iii) states the number of hours (in increments of one-tenth of an hour) spent by each individual providing the services.

| **Subject Matter of Services** | **#** | **Hours** | **Amount Sought** |
|---|---|---|---|
| Initial Filing Matters | #1 | 5.8 hrs. | $2,313.50 |

The services provided in this category included, without limitation, (i) drafting petition, 20 largest creditor list, and creditor matrix; and (ii) work with client and corporate counsel regarding information needed for initial filings and initial information for proceeding during Chapter 11.

| Secured Creditor Work | #2 | 92.3 hrs. | $36,617.50 |

The services provided in this category included, without limitation, (i) research regarding failure to record assignment of mortgage and claim disallowance for lost assignment and standing with respect to Loan; (ii) communications with Lender regarding its claims, Debtor's claims against Lender, possible plan, possible purchase of loan by Debtor; (iii) reviewing documents to assess who is lender, (iv) drafting chronology of Loan (assignments/modifications/all collateral documents); (v) research potential defenses to Loan including potential interest act violation; (vi) research regarding potential *res judicata* affect from guarantor suit; (vii) drafting/final of "no shop" letter to present to Lender; (viii) work on offer to purchase Loan; (ix) work on documentation between Five Mile and Deutsche to assess who Lender was and whether any defects that could be used by Debtor; (x) review and compare

proof of claim filed by each Five Mile and Deutsche; (xi) prepare objection to claims; (xii) work on written and oral communications with Lender counsel regarding its demands for payment during case, a potential plan, conducting a settlement meeting; and (xiii) telephone conference with Lenders as to potential case resolution.

| | | | |
|---|---|---|---|
| Cash Collateral/<br>PNC Control Account Matters | #3 | 59.8 hrs. | $22,018.00 |

The services provided in this category included, without limitation, (i) analyzing the PNC control account agreement and escrow agreements; (ii) research custodial issues with respect to PNC and Section 543 of the Code; (iii) draft, negotiate and prosecute motion regarding the control account; (iv) work on budgets with client for cash collateral motions; (v) prepare and prosecute motion to use cash collateral; (vi) prepare for and conduct evidentiary hearing to get budget approved; (vii) work with client regarding payables and how budget worked; (viii) draft and prosecute additional interim motions to use cash collateral; (ix) communications with Lender and client regarding cash collateral; (x) negotiate with new Lender counsel for more comprehensive interim cash collateral order; (xi) draft and final of new interim cash collateral order; and (xii) attend to notice for final cash collateral motion.

| | | | |
|---|---|---|---|
| Leases and Contracts | #4 | 62.3 hrs. | $22,509.00 |

The services provided in this category included, without limitation, (i) working and negotiating with counsel for Van Ru regarding status of lease, Escrow Funds, claims against Lender, negotiating a temporary rent abatement; (ii) work with clients regarding temporary solutions to Van Ru and Ex Librius lease issues; (iii) drafting and prosecuting motion to abate Van Ru rents; (iv) research for and prepare memorandum in support of motion to abate and against oral and written opposition filed by Lender; (v) working with Ex Librius regarding its lease; (vi) research regarding and oppose Ex Librius motion to vacate stay; (vii) research on

state law allowing termination of lease by tenant; and (viii) attended all court hearings on the leases.

<u>Creditor Communications</u>         #5         17.4 hrs.         $5,527.00

The services provided in this category included, without limitation, (i) communicating with counsel for creditors regarding status of case and their claims; (ii) work regarding pre-petition payroll preparing and prosecuting motion to pay claims; (iii) prepare and prosecuted motion to set bar date; (iv) work to ensure notice of bar date got to all creditors; and (v) work regarding former tenant's audit claim.

<u>Client Communications</u>         #6         14.1 hrs.         $6,138.50

The services provided in this category included, without limitation, communicating by telephone, in-person and by email regarding all significant events and aspect of the case.

<u>Utilities</u>         #7         26 hrs.         $7,425.50

The services provided in this category included, without limitation, (i) preparing and prosecuting motion to enjoin termination and/or alteration of utility services; (ii) draft order on utilities and chart for pre-payment as adequate assurance payments; (iii) ensure notice of order on all utilities; and (iv) work regarding Constellations contract which expired on its own terms during case e.g. true-up payments under order and negotiate regarding new contract.

<u>Reorganization/Property Value</u>         #8         15.6 hrs.         $6,782.00

The services provided in this category included, without limitation, (i) gathering facts that could impact on Property value, (ii) working with client on value analysis, (iii) working with tax counsel on impact on various restructuring options, (iii) preparing offer on Property as basis for potential reorganization, and (iv) prepare and present motion to extent exclusive period which motion was granted.

12

<u>Schedules/Statement
of Financial Affairs</u>          #9          30.1 hrs.          $8,607.50

The services provided in this category included, without limitation, (i) gather information from client and documents to prepare schedules and statement of financial affairs; (ii) prepare drafts and final of schedules and statement; and (ii) work with client throughout process on edits needed to various drafts.

<u>Administrative Work</u>          #10          34 hrs.          $10,656.00

The services provided in this category included, without limitation, (i) drafting and prosecuting application to appoint counsel; (ii) preparing for and attending with client initial UST meeting; (iii) prepare for and attend with client Section 341 meeting; and (iv) work with Debtor on monthly UST reports.

<u>Rule 2004 work</u>          #11          27.7 hrs.          $9,704.50

The services provided in this category included, without limitation, (i) drafting and prosecuting motion for Rule 2004 examinations, (ii) drafting document exhibits for production; (iii) negotiating with Lender as to terms of Rule 2004 Order, (iv) several court appearances on the Rule 2004 motion, (v) preparing all subpoenas for documents, (vi) communicating with subpoena respondents to secure documents, (v) reviewing produced documents from Eastdil, (vi) negotiation with Lender regarding scope of requested documentation; and (vii) negotiated regarding confidentiality agreement and work on edits of same.

<u>Adversary Complaint
Against Lender</u>          #12          53.3 hrs.          $19,884.00

The services provided in this category included, without limitation, (i) research on various causes of action including declaratory relief, breach of good faith and fair dealing, breach of contract, equitable subordination, conversion, and defenses/claims/options with regard to

Lender's failure to release Escrow Funds, (ii) work with clients regarding facts of case and fact section of the Complaint, (iii) reviewing history/emails/underlying documents to gather facts for Complaint, (iv) work on service of Complaint—in particular, service on foreign bank, (v) reviewing answers to Complaint, (vi) attending hearing on Complaint, (vii) reviewing motion for summary judgment on Count V; (viii) prepare and issue discovery in case; and (ix) work with Lender on search terms for electronic discovery.

<u>Real Estate Taxes</u>              #13           16 hrs.      $5,087.00

The services provided in this category included, without limitation, (i) working with client and PNC to determine what funds were in the tax escrow and what was available for payment of taxes, (ii) preparing and prosecuting motion to authorize payment of real estate taxes, (iii) communicating with Lender regarding tax bill, and (iv) working to get funds timely to Cook County Treasurer.

26.   BT also seeks $9,781.31 for costs and expenses it incurred in connection with this case during that same period that are reimbursable under applicable rules. The expenses are as follows:

| **Expense Category** | **Amount** |
|---|---|
| Photocopy Charges ($.10/copy) | $196.20 |
| Filing Fees [petition] | $1,039.00 |
| Filing Fees [adversary complaint] | $ 240.00 |
| Conference call charges | $ 10.52 |
| Messenger/ Overnight Deliveries | $ 47.02 |
| Recorder Deed Search | $ 225.00 |

| Expense Category | Amount |
|---|---|
| Pacer Court Fees | 90.52 |
| Westlaw/Lexis Research (at cost) | $7,933.05 |
| **Total** | $9,781.31 |

WHEREFORE, Barnes & Thornburg LLP respectfully requests that the Court enter an order substantially in the proposed form attached hereto (i) awarding BT $163,270.00 in attorney fees, as debtor in possession counsel, from the Petition Date through the date of its withdrawal as Debtor's counsel; and (ii) awarding reimbursement of expenses in the amount of $9,781.31 which were advanced by BT, for the same period.

**BARNES & THORNBURG LLP**

By: */s/ Paula K. Jacobi*
One of its Partners

Paula K. Jacobi (ARDC No. 1311247)
Jennifer A. Kimball (ARDC No. 6291184)
**Barnes & Thornburg LLP**
One North Wacker Drive
Suite 4400
Chicago, Illinois 60601
(T) (312) 214-8307
(F) (312) 759-5646
pjacobi@btlaw.com